See, also, Bishop, Evidence, Pleading, and Practice, 113, 273; Mains v. State, 42 Ind. 327, 13 Am. Rep. 364; Leary v. State, 39 Ind. 544; Waterman's Crim. Dig. p. 478, §§ 120, 121.

The judgment is therefore set aside and the indictment quashed, and the defendant ordered released without day.

———

(36 South. 670.)

No. 14,777.

HAAS v. NEW ORLEANS RYS. CO.

(May 14, 1904.)

STREET RAILWAYS—PERSONAL INJURIES—NEG-
LIGENCE—DUTY OF MOTONEER—EVI-
DENCE—SUFFICIENCY.

1. In a case sounding in damages growing out of a collision between an electric car and a float, the crowded street rendered it necessary to be more than usually careful.

2. It devolved upon the floatman not to attempt to cross in face of danger, and the motoneer to hold his car under control so as to be able to stop within the shortest possible distance. The failure was with the latter.

3. The court carefully examined the testimony, and, after consideration, concluded that the weight of the testimony was with plaintiff, and affirmed the verdict of the jury and the judgment of the district court.

On Rehearing.

4. The amount allowed by the verdict was reduced, as will be seen by consulting the decree.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

Action by John Haas against the New Orleans Railways Company. From a judgment for plaintiff, defendant appeals. Modified.

Denègre, Blair & Denègre (Victor Leovy, of counsel), for appellant. Frank Edward Rainold, for appellee.

BREAUX, C. J. Plaintiff sued the defendant for $10,000 damages for personal injuries he alleges he suffered from an accident' for which he seeks to hold the latter liable.

The case was tried before a jury. They returned a verdict for plaintiff for the sum of $2,500.

There was a collision at about 4 p. m. between a car of the defendant company and a heavy two-mule dray or float, driven by plaintiff on April 19, 1902, on Tchoupitoulas street, between Poydras and Natchez alley.

Tchoupitoulas has one line of cars, and during the working hours its capacity is sometimes tested by the many wagons and drays conveying loads of merchandise to or from the different commercial houses located on this street, for, although it is a busy street, it is not at all broad.

According to the evidence, plaintiff and his helper were employed in hauling coffee for Stewart, Carnel & Co. The driver was seated on the left, and Smith, the helper, on his right. They drove down the street in the direction of Canal street, on the right or river side of the street, to a point opposite the store of Coleman Bros. The mules were facing Canal street. They were at a standstill until the driver sought to cross the street from right to left. It became necessary in crossing, or attempting to cross, to make a turn, or follow or describe about half of a circle. Before attempting to cross, plaintiff

and his helper rose from their seats on the dray, and stood up to see where the car was. The driver says that he saw the car on the south side of Natchez alley, a distance of about 250 feet from where he was stopped at the time with his dray, and that the car had stopped. It was then that he attempted to cross the street by making the turn in question.

When about midway the turn, a spring wagon, which was coming down the street on its way to Canal, on the left or wood side of the street, stopped his mules, and brought the dray to a dead stop while it was still on the car track. By the turn made by the mules the wheels of the dray had become locked, and could not be moved while these mules were pulling at right angle from the float.

Plaintiff's witnesses testify that they saw the advancing car only when it was about 12 feet from the float. It was then too late to prevent the collision. The car struck the front wheel of the float. The helper jumped down, fell, but was not injured. The driver was thrown down and injured. We will refer to the extent of the injury later.

There are points of difference in the testimony.

The testimony of the motoneer impresses us as that of an intelligent and truthful witness. He seems to understand thoroughly the work of running electric cars. He says that he made a stop at the crossing of Canal and Tchoupitoulas and took on passengers, and that at Gravier street he made another stop for another passenger. He rang his gong for Natchez alley, and had passed this point about a car's length when he saw a float coming from the left side of the street; the mules were almost directly across the street; the streets were damp; he put on the brakes; he was then about 45 feet away from the float; he was confident that the driver, at the time he was undertaking to cross the street as before mentioned, could

not see the car, because his view of the car was obstructed by a double team wagon that stood in front of Lazard Levy's store; that when he came in view of the car he had the car reverse on. It did not prevent the bumper of his car and the front wheel of the float—that is, the wheel on the Canal street side—from colliding as before mentioned. This witness denies emphatically that he was blocked by wagons or drays at any time prior to the collision. He states that he did not see the float before it started across the track, because his view was obscured by the wagon in front of Lazard Levy, and plaintiff, he says, was prevented by the same cause from seeing the car when he, plaintiff, started to cross the street.

It is but just here to mention, as it has, as read by us in the record, every appearance of entire sincerity, that this witness said:

"There was nothing on earth that I did not do, that I could do, to avoid that accident; if it had been my own brother or father, I couldn't possibly avoid it, and when I saw the man was hurt, possibly, by the accident. I was sincerely sorry, and nobody around there or near there tried to attach any blame to me at the time."

With reference to the extent of the injury suffered by plaintiff, there is difference of opinion.

His attending physician has found it much greater than the two other physicians who testified.

One of these physicians says that when he examined plaintiff there was no permanent injury, or any condition that would affect his physical condition.

We are informed by the testimony that, within the time that plaintiff said he was still suffering greatly, he met a party of acquaintances and sparred and skylarked with them, and presented the appearance of a man who was not in a great suffering condition.

We will not stop to point out with great particularity certain inconsistencies or con-

tradictions in the testimony of witnesses. There was fault, negligence, or error of judgment on the part of one or the other—the motoneer or the driver. We are not inclined to the conclusion that it was an accident entirely unavoidable.

The drayman has the right to the use of the streets, and to cross from one side to the other of the street after having exercised due care and precaution to avoid collision. The defendant railway, on the other hand, has the right to the use of its tracks, and to run its cars in carrying its passengers.

The testimony leads to the unavoidable inference that plaintiff stopped to satisfy himself whether or not the way was clear. The strong probabilities are, according to the testimony, that he would have made the crossing in time to escape injury if he had not been stopped by the small wagon on the opposite or wood side of the street. Cases such as these do not fall within the terms of any particular rule regarding negligence.

Each case is to be decided largely on its particular facts. The driver had gone on the track, and was prevented by a sudden obstacle from effecting the crossing as he expected.

Suddenly the car, masked from view by the wagon, ran up and struck his dray, and caused the fall of which plaintiff complains.

It is the duty of the drayman to leave the track when the car approaches, and not to impede it when it crosses the street, but, if the dray is stopped while attempting to cross, the drayman can scarcely be held at fault for an act over which he had no control.

How is it with defendant? Is the showing made by the testimony such as to justify us in setting aside the jury's verdict?

It is the duty of the company to exercise ordinary care, or it must respond in damages.

The company's employé should guard against accident in a street where it would not otherwise be reasonably safe to run the car. He should, in a busy street, as this seems to be, keep a "lookout." He must keep control of the car in order to be able to stop it within a reasonable distance.

The instruction of defendant's company was, "when approaching vehicles or persons on the tracks, to give several strikes on the gong, and not to run nearer than 50 feet of same unless your car is under perfect control."

We infer that defendant's employé saw or should have seen this dray at a distance of 50 feet, and that if under control, as required, it would have been possible to stop his car within that distance.

The car was traveling at slow rate (about six miles an hour) on a busy street in which there were many vehicles, which required, when passing wagons, greater attention than must be given in other thoroughfares.

We understand that it is frequently dangerous, owing to the crowded number of wagons in the street, to run at a rate over four miles an hour. At that rate of movement of the car, after defendant's employé saw the dray, even according to his own statement, it would have been possible to stop in time to prevent the accident.

The statement of the motoneer also is that his view on the track was obscured by a wagon on the side of the street between the point at which plaintiff's wagon was stopped, as mentioned before, and the car. It occurs to us that a motoneer in a very busy street should be alert, and actively begin to apply his brakes, on losing command of the view immediately in front of his car. Had he, at the time that his view became obscured, as we appreciate the facts, commenced to apply the brake and slacken the speed of his car, he would have been amply able to stop his car in time.

In ascertaining the facts, something is left to the discretion of the jury; they see and

hear the witnesses, and have the opportunity of forming their conclusion from personal observation.

We have not discovered that they have erred in their finding for plaintiff.

This brings us to the consideration of the quantum of damages.

Plaintiff was confined about four weeks to his bed. He suffered considerably. His daily earnings prior to his fall were small. The testimony of the defendant's witnesses to the effect that plaintiff had a friendly bout with a companion on a cool and bracing December morning over seven months after he had received injury has no importance in determining the amount.

It only arrests attention because of plaintiff's eagerness as a witness to deny that he sparred at all. It creates the impression of a general negation, even of that which should have no bearing, and which could have been allowed to pass without giving it the special attention it received from plaintiff as a witness.

Considering the facts and views of physicians as a whole, we arrive at the conclusion that the amount allowed by the jury should remain unchanged.

It is therefore ordered, adjudged, and decreed that the verdict and judgment of the court a qua be, and the same is hereby, affirmed.

### On Rehearing.

### (May 23, 1904.)

In this case the court, after having heard the application for a rehearing, decided to reject it, save as to the amount of the judgment, which will be fixed at $1,500, instead of $2,500.

The law and the evidence being with plaintiff, the application for a rehearing is refused. The judgment prior to this refusal was amended.

It is now ordered that plaintiff do have judgment against defendant for $1,500, with interest thereon as previously decreed, instead of, as heretofore, $2,500.

After amendment, rehearing refused.